**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JANICE G. COCLOUGH, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| AKAL SECURITY, INC., *et al.*, | ) |
| | ) |
| Defendants. | ) |

Civil Action No. 16-2376 (BAH)

## <u>MEMORANDUM OPINION</u>

Plaintiff Janice Coclough brings this action under Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), *see* 42 U.S.C. § 2000e *et seq.*, and the District of Columbia Human Rights Act ("DCHRA"), *see* D.C. Code § 2-1401 *et seq.*, against her former employer, Akal Security, Inc. ("Akal") and former supervisors Lois Epps ("Epps") and Josiah Eaves ("Eaves"). *See generally* Second Amended Complaint ("2nd Am. Compl."), ECF No. 24. She alleges discrimination on the bases of her sex and sexual orientation (Counts IV and V), retaliation for having engaged in protected activity (Counts II and VII), and sexual harassment (Count VI). *Id.*[1]

Pending before the Court are defendants' motion for summary judgment on all counts and plaintiff's motion to seal certain exhibits submitted in opposition to defendants' motion. For the reasons discussed below, both motions are granted.

---

[1]      Plaintiff withdrew her claim under the District of Columbia Whistleblower Protection Act (Count VIII). Pl.'s Mem. of P. & A. in Opp'n to Defs.' Mot. for Summ. J. ("Pl.'s Opp'n") at 1 n.1, 44 (page numbers designated by CM/ECF), ECF No. 60.

1

## I.      FACTUAL BACKGROUND

The factual background to this lawsuit has been summarized in prior decisions in this and a related case.  *See Coclough v. AKAL Sec. Inc.*, No. 16-2376, 2017 U.S. Dist. LEXIS 234283, at *1-2 (D.D.C. May 15, 2017); *Coclough v. Akal Sec., Inc.*, 303 F. Supp. 3d 123, 126-30 (D.D.C. 2018) (granting defendants' motion to dismiss Title VII gender discrimination and sexual harassment claims (Counts I, andIII) for, *inter alia*, failure to exhaust administrative remedies, and denying dismissal of Title VII retaliation claim (Count II), DCHRA claims (Counts IV, V, VI, and VII) and Whistleblower Act claim (Count VIII)); *Coclough v. District of Columbia*, No. 19-2317, 2020 U.S. Dist. LEXIS 169920, at *1-2 (D.D.C. Sep. 16, 2020).  Set out below is a description of the facts, based on the record developed over three years of discovery.[2]

From this record, defendants have collated 133 facts, supported by citations to the record, in Defendants' Statement of Undisputed Material Facts in Support of Motion for Summary Judgment ("Defs.' SMF"), ECF No. 55-1.  Plaintiff has done the same, *see* Plaintiff's Response to Defendants' Statement of Undisputed Material Facts ("Pl.'s Resp. SMF"), ECF No. 60-1 at 1-18, relying on over 900 pages of undifferentiated exhibits in a single docket entry containing deposition testimony of plaintiff and other witnesses, *see* Plaintiff's Memorandum of Points and Authorities in Opposition to Defendants' Motion for Summary Judgment ("Pl.'s Opp'n"), ECF No. 60,  Pl.'s Exs. B-I, ECF No. 60-1, and nearly 700 pages of documents filed on CM/ECF in

---

[2]      Since entry of the first Scheduling Order, *see* Min. Order (May 31, 2018), the discovery schedule has been extended 12 times: the Court has granted three consent motions filed by plaintiff, *see* Plaintiff's Consent Motions to Enlarge Scheduling Order, ECF Nos. 47, 48, 50, and seven joint motions to extend discovery, *see* Joint Motions to Extend, ECF Nos. 41, 42, 43; Joint Motion to Extend Discovery, ECF No. 44; Joint Motions to Enlarge Scheduling Order, ECF Nos. 49, 51, 52.  In addition, the Court issued a new scheduling order on November 26, 2019, after the parties' mediation efforts did not yield a settlement, and extended the discovery deadline yet again after resolving the parties' discovery dispute on April 22, 2021.  The last schedule adjustment came about when, on June 16, 2021, the Court granted defendants' consent motion to extend the deadline for dispositive motions.

wholly redacted form—meaning that they are literally blank, *see id.*, Pl.'s Exs. J-U, X-Z, AA-GG, II-MM, ECF No. 60-1.

### A. Record Relied Upon In Resolving Pending Summary Judgment Motion

As a threshold matter, the record on summary judgment is subject to special procedural rules to facilitate identification and assessment of genuine issues of material fact requiring trial. *See, e.g.*, FED. R. CIV. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion[.]"); D.D.C. LCvR 7(h)(1) ("In determining a motion for summary judgment, the Court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion."); Standing Order at ¶ 5(f), ECF No. 36 (stating "[t]his Court strictly enforces Local Civil Rule 7(h) when resolving motions for summary judgment and will 'assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion.'").

Further, to ensure transparency as to the bases for parties' arguments and judicial decisions, documents may only be submitted under seal with court approval, including any documents considered by a party as confidential or subject to a protective order.  *See, e.g.*, D.D.C. LCvR 5.1 (h)(1) ("Absent statutory authority, no case or document may be sealed without an order from the Court."); Standing Order at ¶ 5(g) (requiring along with motion to seal any document, submission of "a redacted version, suitable for filing on the public docket"); Stipulated Protective Order at 6-7, ECF No. 40 (outlining procedure for filing Confidential Information and requiring "a simultaneous motion and accompanying order pursuant to LCvR

5.1(h)").  As noted, plaintiff's response to defendants' proffered facts and arguments rely, in

part, on evidence not accessible to the public or defendants on CM/ECF because only blank

pages were filed, and thus defendants urge these improperly "sealed" through complete redaction

pages be disregarded and the corresponding facts deemed admitted.  *See* Defendants' Reply in

Support of Motion for Summary Judgment ("Defs.' Reply") at 2-4, ECF No. 61.

      After being directed to show cause explaining why each of plaintiff's completely

redacted exhibits should remain shielded from public view, *see* Min. Order (Jan. 21, 2022),

plaintiff explained that 27 of her 39 exhibits bore defendants' "Confidential" designation—a

designation plaintiff does not challenge—and for this reason she filed these exhibits in wholly

redacted form, Pl.'s Mem. of P. & A. in Supp. of Pl.'s Combined Resp. to Show Cause and

Opposed Mot. to Seal Exhibits *Nunc Pro Tunc* to Sept. 25, 2021 at 2, ECF No. 63.  Belatedly,

plaintiff's counsel moved to seal Exhibits J-U, X-Z, AA-GG, II-MM *nunc pro tunc* to September

25, 2021, *see* Pl.'s Combined Resp. to Show Cause and Opposed Mot to. Seal Exhs. *Nunc Pro*

*Tunc* to Sept. 25, 2021, ECF No. 62, which motion remains pending.

      In opposing plaintiff's motion to seal, defendants indicate that plaintiff did not provide

unredacted copies of her blank exhibits upon request and that, if plaintiff's noncompliance with

the local rules, the Standing Order and Stipulated Protective Order were to be excused,

defendants would suffer significant prejudice, having been denied an opportunity to review

plaintiff's exhibits and to determine the sufficiency of information contained therein as presented

in support of plaintiff's claims.  *See* Defs.' Opp'n to Pl.'s Combined Resp. to Show Cause and

Opposed Mot. to Seal Exhs. *Nunc Pro Tunc* to Sept. 25, 2021 at 2-4, ECF No. 65.  Further, if

briefing were reopened at this late stage, defendants would face a substantial hardship,

particularly given the time and expense already devoted to this case.  *See id*. at 3-4.

The Court accepts the parties' representation that defendants designated Exhibits J-U, X-Z, AA-GG, II-MM "Confidential Information," and, thus, that plaintiff should have filed these exhibits under seal with a contemporaneous motion seeking permission to file the documents under seal, along with redacted versions available on the public docket.  This did not occur and therefore plaintiff failed to comply with applicable procedural rules.[3]  Indeed, plaintiff has managed to defy this Court's Standing Order, Local Civil Rule 5.1(h)(1), and the parties' Stipulated Protective Order, leaving defendants at a disadvantage.  Insofar as plaintiff supplied Bates-stamp numbers for her exhibits, defendants theoretically could have identified the exhibits to which plaintiff referred in her briefing and SMF, but this method of litigating has foisted upon defendants the task of ferreting out which exhibits, or portions of exhibits, plaintiff relies upon rather than highlighting the information she presents in support of her claims.

Plaintiff's flouting of the rules left the Court at a disadvantage, too.  If the Court had not ordered the parties to submit courtesy copies of their filings, *see* Min. Order (July 8, 2021), only the exhibits on CM/ECF—containing hundreds of blank pages—would have been accessible to and reviewable by the Court.  Unlike the parties, the Court does not have access to all the discovery materials and, therefore, could not have identified the actual text of plaintiff's exhibits using the Bates-stamp numbers applied by the parties.

Review of plaintiff's courtesy copy of her opposition, which included unredacted exhibits, reveals that many of plaintiff's exhibits contain sensitive information that should not be

---

[3]     Notwithstanding the parties' acknowledgment that the exhibits filed under seal are confidential, plaintiff discloses information contained in certain of those exhibits in her publicly available opposition brief.  For example, exhibits pertaining to plaintiff's proposed comparators were filed in wholly redacted form, *see* Pl.'s Opp'n, Exs. L, M, N, O, P, Q, and R, yet plaintiff reveals their identities and discusses the misconduct with which they were charged, *see* Pl.'s Opp'n at 11-18 (page numbers designated by CM/ECF).  No explanation is offered for plaintiff's inconsistent treatment of confidential information.  These comparators are referred to in this Memorandum Opinion by their initials.

available on the public docket.  Rather than parse which exhibits or portions of exhibits should

be sealed, the plaintiff's motion to seal will be granted, with Exhibits K-U, X-Z, AA-GG, II-MM

permitted to be placed under seal.  Counsel's lapses are not excused, however.  Other than the

deposition testimony plaintiff has submitted, the Court will consider only those exhibits or

portions of exhibits on which defendants also rely: (1) Collective Bargaining Agreement, *see*

Defs.' Mem., Ex. A, Dep. of Janice Coclough ("Pl.'s Dep."), Ex. 1, ECF No. 55-3 at 68-102;

Pl.'s Opp'n, Ex. J; (2) July 1, 2016, Report of Investigation, *see* Defs.' Mem., Ex. C, Dep. of

Richard Parris ("Parris Dep."), Ex. 1, ECF No. 55-5 at 27-79; Pl.'s Opp'n, Ex. LL;[4] (3)

Plaintiff's June 24, 2016, letter of appeal, *see* Pl.'s Dep., Ex. 11, ECF No. 55-3 at 175-76; Pl.'s

Opp'n, Ex. BB; (4) Plaintiff's June 23, 2016, EEOC charge of discrimination, *see* Pl.'s Dep., Ex.

14, ECF No. 55-3 at 184-85; Pl.'s Opp'n, Ex. CC; and (5) records pertaining to comparator CSO

M.J., *see* Defs.' Mem., Ex. B, Decl. of Libby Henninger ("Henninger Decl."), Ex. 12, ECF No.

55-4 at 96-104; Pl.'s Opp'n, Ex. P.

**B. Akal's 12th Circuit Contract**

Akal "provides security services through contracts with government agencies throughout

the United States, including its former contract with the United States Marshals Service

('USMS') for the 12th Judicial [Circuit]."  Defs.' SMF ¶ 1.  The contract, in effect for about five

years, from March 1, 2012, through May 31, 2017, included security services for the District of

Columbia Courts ("D.C. Courts").  *Id.* ¶ 2.  As part of this contract, Akal employed Court

Security Officers (CSOs), Special Security Officers (SSOs), Lead Court Security Officers

(LCSOs) and Lead Special Security Officers (LSSOs) to work in District of Columbia court

---

[4]       The only distinction identified in the July 1, 2016, Report of Investigation between the parties' submissions
of this report is the correction of a typographical error on the first page of the report.

buildings including the Moultrie Courthouse at 500 Indiana Avenue, N.W., Washington, DC. LCSOs work as court security officers and take on additional duties, such as conducting roll call and scheduling employees, *id.* ¶ 33, but have no authority to impose discipline other than to "refer concerns they witness to their supervisors," *id.* ¶ 34.[5]

Generally, Akal employees on the 12th Circuit contract were "subject to the oversight of [USMS] which has ultimate approval as to whom can work on the contract." *Id.* ¶ 25. Richard Parris ("Parris"), former Chief of Security for the D.C. Courts, served as the contracting officer's representative ("COR" or "COTR"). *See id.* ¶¶ 3, 30. He "had the authority to remove employees from working on the 12th [Circuit] Contract" at the D.C. Courts. *Id.* ¶ 3; *see* Defs.' Mem., Ex. E, Dep. of Joseph Trindal ("Trindal Dep.") at 40:18-41:2, ECF No. 55-7; Parris Dep. at 38:7-9. He did not have the authority to terminate the employment of an Akal employee. *See* Parris Dep. at 111:8-13. Ordinarily, Parris was not involved with the discipline of Akal employees working on the 12th Circuit contract, *see* Parris Dep. at 39:6-10, with only two exceptions during his tenure involving the disciplinary matters of plaintiff and of former LSSO A.C, *see* Parris Dep. at 39:2-22.

### C. Akal Employment Policies

Akal had "an equal employment opportunity policy prohibiting job discrimination, harassment, or retaliation for protected conduct," Defs.' SMF ¶ 4, and made "employment decisions on the basis of merit and other non-discriminatory factors," *id.* ¶ 5. In addition, the company had "an Anti-Harassment, Anti-Discrimination, and Retaliation policy which prohibits sexual and other forms of unlawful harassment based upon . . . sex, gender, . . . [and] sexual

---

[5]     The record is unclear whether and what differences in job requirements exist between CSO and SSO and between LCSO and LSSO.

orientation.  *Id.* ¶ 6.  Plaintiff does not dispute the existence of these policies, instead complaining that Akal failed to follow them.  *See* Pl.'s Resp. SMF ¶¶ 4-6.

"Retaliation against employees who in good faith report alleged harassment or discrimination [was] strictly prohibited."  Defs.' SMF ¶ 7.  Akal offered alternative methods by which employees could report suspected violations of policy or law: report to a supervisor, report to Akal's Human Resources Department, or anonymous toll-free call to the Akal Employee Hotline which an independent third party monitored.  *See id.* ¶¶ 8-9.

"Plaintiff was provided Akal's policies and procedures and was aware of incident reporting policies and mechanisms for reporting any complaints she may have [had] while employed with Akal."  *Id.* ¶ 11.  She also had "annual sexual harassment training while employed by Akal which detailed procedures for reporting complaints."  *Id.* ¶ 12.

### D. Collective Bargaining Agreement

Akal entered into a Collective Bargaining Agreement ("CBA") with the International Union, Security, Police and Fire Professionals of America ("Union"), and its Local 443, for LCSOs and LSSOs at the D.C. Courts.  *See* Defs.' SMF ¶ 13; *see generally* Pl.'s Dep., Ex. 1, ECF No. 55-3 at 68-102.  Among other matters, the CBA addressed seniority, overtime, grievance procedures, and discipline.  *See* Defs.' SMF ¶ 14.

#### 1. Seniority and Overtime

"Overtime was to be distributed as equitably and fairly as practicable among [e]mployees regularly assigned to a particular work location[.]"  Defs.' SMF ¶ 16.  First, an overtime opportunity was to be "filled . . . on a voluntary basis using seniority on the shift where the overtime opportunity exist[ed]."  *Id.* ¶ 17.  If the assignment could not be filled this way, "bargaining unit members at the site on other shifts [were] offered the overtime in seniority

order, and then if the assignment cannot be filled, the overtime [would have been] offered to other bargaining unit members in the 12th Judicial Circuit." *Id.* ¶ 18.  If shifts still could not be covered on a voluntary basis, overtime assignments were "filled amongst those on the same shift by reverse building seniority." *Id.* ¶ 19.  Lastly, if no other method worked, the overtime slot was assigned to "time shares, who did not have set schedules and were required to 'fill in' any open spaces." *Id.* ¶ 20.

Plaintiff has not disputed these CBA terms and instead complains that compliance with them was not Akal's common practice.  *See* Pl.'s Resp. SMF ¶¶ 16-19.  For example, according to plaintiff, the managers responsible for scheduling offered overtime to certain favored employees. *See id.* ¶¶ 17-18.

### 2. Grievances

Generally, an employee could "bring a grievance for a 'claimed violation, misinterpretation or misapplication of any provision of [the CBA] or . . . challenge . . . any disciplinary action taken against a Union employee.'"  Defs.' SMF ¶ 22.  The CBA sets forth an exception in Article #5 which provides:

> [T]he grievance procedures outlined herein shall not apply to any situation where the Company is acting under written directives of the U.S. Marshals Service, Contracting Officers Technical Representative (COTR) or any member of the judiciary, provided however, that the Union may grieve the accuracy of any information provided by the Employer to the U.S. Marshals Service, COTR or member of the judiciary that formed the basis of the directive.

Pl.'s Dep., Ex. 1 at 8-9, ECF No. 55-3 at 78-79.  In other words, "[t]he grievance procedures [did] not apply to situations were Akal [was] acting under written directives of [USMS] or any member of the judiciary," Defs.' SMF ¶ 23, aside from an employee's right to challenge the

accuracy of information Akal provided to its client about the underlying incident, *see* Pl.'s Resp. SMF ¶ 23.

### 3. Discipline

The CBA provided that no employee could "be disciplined without just cause, unless the employee is ordered by the D.C. Courts to be removed from working under Akal's contract with the D.C. Courts, or if the employee's credentials are denied or terminated by the Marshals Service." Defs.' SMF ¶ 24.[6]  The Union had "the right to grieve . . . on behalf of disciplined employees except in cases when Akal [was] acting under the directive of the judiciary or when the D.C. Courts . . . notified Akal in writing that the D.C. Courts . . . lost confidence in the employee." Defs.' SMF ¶ 26.[7]

### E. Plaintiff's Employment as CSO and LCSO at the D.C. Courts

Plaintiff, who had been employed as a CSO on the 12th Circuit contract by Akal's predecessor, continued in that position when Akal took over the contract in March 2012.  *See* Defs.' SMF ¶¶ 27-28.  She became LCSO, a promotion with additional responsibilities, though the parties are silent as to any pay increase, effective December 17, 2014, *see id*. ¶¶ 27, 33, and

---

[6]     Plaintiff's response to Defs.' SMF ¶ 24 indicates that this statement is "Disputed," and goes on to argue that "[p]laintiff was investigated and disciplined without just cause when Akal opened an investigation into alleged workplace harassment allegedly perpetrated by [p]laintiff, in an attempt to help justify the snap decision by Richard Parris to terminate [her]."  Pl.'s Resp. SMF ¶ 24.   This response is both conclusory and argumentative, and fails to address the fact defendants proffer.  Thus, this fact is deemed admitted.  *See Robertson v. Am. Airlines, Inc.*, 239 F. Supp. 2d 5, 9 (D.D.C. 2002) (faulting a statement of undisputed material facts which "liberally mixes facts with argument" and "does nothing to assist the court in isolating the material facts, distinguishing disputed from undisputed facts, and identifying the pertinent parts of the record").

[7]     Plaintiff's response to Defs.' SMF ¶ 26 indicates that this statement is "Disputed," and goes on to explain that "CBA Article 5 Grievance Procedure states, 'Union may grieve the accuracy of any information provided by the Employer to the U.S. Marshals Service, COTR or member of the judiciary that formed the basis of the directive.' Thus, the grievance procedure does apply to situations where Akal is acting under the directive of the judiciary." Pl.'s Resp. SMF ¶ 26.  Plaintiff correctly quotes the CBA, which authorizes the Union to challenge *the accuracy of information* Akal provided about the incident giving rise to the judiciary's directive.  Otherwise, the CBA does not permit the Union to grieve discipline imposed on a member when Akal acted at its client's direction and thus the proffered fact is deemed admitted.

was covered by the CBA, *see id.* ¶ 13.  At all relevant times, plaintiff reported to District Supervisors Epps and Eaves, *see* Defs.' SMF ¶ 29, who, in turn, reported to Akal's Contract Manager, Lawrence Frost ("Frost"), *id.* ¶ 35.

As LSCO, plaintiff continued to perform the functions of CSO, *see* Defs.' SMF ¶ 33, while taking on certain payroll functions, *see id.* ¶¶ 36-39; Pl.'s Resp. SMF ¶¶ 36-39.  "Plaintiff also acted as a trainer on the contract, responsible for ensuring that training of court security officers was being conducted" in accordance with the contract, Defs.' SMF ¶ 44, until her resignation from that role on February 23, 2016, *id.* ¶ 45.  The specific factual allegations underlying plaintiff's various claims are detailed below.

### 1. Plaintiff's Sexual Orientation

Plaintiff, a gay woman, "never discussed her sexual orientation with anyone at Akal," Defs.' SMF ¶ 46; Pl.'s Dep. at 258:19-21.  During her tenure with Akal, neither Epps, Eaves nor Parris (who is openly gay) knew plaintiff's sexual orientation.  Defs.' SMF ¶ 46; *see* Defs.' Mem., Ex. G, Dep. of Lois Epps ("Epps Dep.") at 16:6-8, ECF No. 55-9; *id.*, Ex. D, Dep. of Josiah Eaves ("Eaves Dep.") at 206:9-12, ECF No. 55-6; Parris Dep. at 127:1-2.

Plaintiff testified that officers would "say terrible things about gay people," Pl.'s Dep. at 259:13-14, including Parris whom plaintiff says "they . . . crucified . . . by just verbal attacks about his sexuality," Pl.'s Dep. at 259:10-11.  She also testified about rumors in the workplace that she is gay and that she was in a relationship with another female CSO.  *See* Pl.'s Dep. at 91:7-92:2, 259:20-260:2.  Further, she testified that "they were already assuming" she was gay, Pl.'s Dep. at 259:22-260:1, and "because of their assumptions [she] was already being treated differently," Pl.'s Dep. at 260:1-2.  Her testimony provides little detail and does not, for example, describe who treated her differently or how she was treated differently.

11

### 2. Overtime and Scheduling

"Plaintiff felt that the LCSOs responsible for . . . schedul[ing] and assigning overtime were doing so in an unfair or preferential manner[.]"  Defs.' SMF ¶ 55.  Specifically, she "complained that she was not receiving overtime," Pl.'s Resp. SMF ¶ 55, and she raised her concern to Epps and Eaves, *see id.*; Defs.' SMF ¶ 55.  She did not, however, file a grievance "related to any concerns with overtime distribution or scheduling."  Defs.' SMF ¶ 57.

Akal received several anonymous complaints via the Hotline about scheduling.  Defs.' SMF ¶ 60.  Three of these complaints, each submitted in May 2016, alleged that the "LCSO in charge of scheduling showed favoritism in scheduling his 'cronies' and disregarded seniority and preferencing male[]" employees.  *Id.* ¶ 61.  Investigation of these matters was assigned to Arthur Kohn, a District Supervisor at another D.C. Courts building.  *See id.* ¶¶ 62-63, 68.  Kohn's investigation included review of relevant documents and interviews with Eaves, Epps and the LCSO who prepared the schedules.  *Id.* ¶ 64.  "It was determined that the LCSO followed a seniority system in making . . . scheduling assignments and that the allegations [of] abusing his authority or engaging in favoritism . . . were unfounded."  *Id.* ¶ 65.

Akal later received an anonymous complaint that Kohn's investigation was biased.  *Id.* ¶ 66.  "When an allegation involve[d] a District Supervisor, the Contract Manager conduct[ed] the investigation to eliminate any appearance of bias[.]"  *Id.* ¶ 69.  Accordingly, Frost conducted the investigation, *id.* ¶ 67, and "found no evidence to support an allegation of investigative bias against Kohn and the complaint was not sustained," *id.* ¶ 70.

### 3. Camera and Intercom Use by Control Room Personnel

Plaintiff alleges use by Akal employees of communications equipment and security cameras in a manner that bolsters her claims, including of sexual harassment, as described below.

#### a. "Zooming In"

Plaintiff alleged that "[m]ale employees would call each other into the control room" and "in full view of [p]laintiff and other female Akal employees, . . . use the camera equipment to watch . . . women enter" the courthouse and "train the cameras onto women's body parts." 2nd Am. Compl. ¶ 19.  Defendants proffered that "[a]t no time during [p]laintiff's employment was any complaint ever received by anyone at Akal indicating that any employee in the control room improperly used surveillance cameras to 'zoom in' on the body parts of individuals or otherwise made any inappropriate or lewd statements about any individual they viewed through the cameras."  Defs.' SMF ¶ 71.

Without actually mentioning cameras "zooming in" on the body parts of female entrants to the courthouse, plaintiff responded to defendants' proffered fact by asserting that "Eaves and Epps repeatedly failed to act after [she] reported cyber stalking, sexual harassment and discrimination to them."  Pl.'s Resp. SMF ¶ 71.  She also pointed to portions of her own deposition testimony, *see id.*, none of which addresses these allegations of misuse of surveillance cameras by control room personnel.

#### b. "Following" Plaintiff Throughout the Courthouse

Plaintiff has alleged that, "[o]n a daily basis throughout 2014-2016," 2nd Am. Compl. ¶ 37, "[s]ecurity personnel in the control would use cameras to follow [her] and her coworker wherever they were in the building, and would use the intercom system to make lewd

comments," *id.* ¶ 38.  The control room personnel were a man and a woman, George Gamble and Elaine Payne, *see*  Pl.'s Dep. at 77:19-78:10, and the coworker was Aletha Adams, with whom plaintiff had lunch most days, *see* Pl.'s Dep. at 83:1-13.

Plaintiff testified that Gamble and Payne would track plaintiff's and Adams' movements throughout the courthouse on surveillance cameras and would use the intercom system, for example, to ask where the two were going or whether they were going to lunch, or upon their return to the courthouse, to acknowledge Gamble and Payne had seen plaintiff and Adams together.  *See* Pl.'s Dep. at 78:11-79:6; 176:14-177:4.  This "daily ritual," *id.* at 83:13, left plaintiff feeling "very uncomfortable and invaded as a result," *id.* at 269:12-13.  This behavior "was bothering" plaintiff, Pl.'s Dep. at 87:3, but Adams "would just laugh and tell [plaintiff not to] worry about it," Pl.'s Dep. at 87:7-8.  Plaintiff testified that she brought this matter to Epps' and Eaves' attention, claiming that she "was being harassed," Pl.'s Dep.  at 86:13, and that neither supervisor took any action, *see* Pl.'s Dep.  at 85:13-86:10.

### 4.  "Sitting in Adams' Lap"

Plaintiff testified that, in the spring of 2016, she and Adams were talking at the booth at the exit from the courthouse garage when CSO Kevin Best came by.  *See* Pl.'s Dep. at 94:6-8.  Ordinarily, she explained, the three would have had "a few words, but this time he [Best] didn't come over."  Pl.'s Dep.  at 94:9-10.  When plaintiff asked Best why he did not stop, "he said because [he] thought [plaintiff] was sitting on [Adams'] lap," Pl.'s Dep.  at 94:12-13, and "he wanted to give [them] privacy," Pl.'s Dep.  at 258:1. When asked what she believed Best to be implying, plaintiff responded, "[t]hat – I don't know.  It was – he was inappropriately accusing me of siting on her lap.  I don't know, I was so upset."  Pl.'s Dep. at 258:4-6.

### 5. "Sexual Comments" of an LCSO

At her deposition, plaintiff testified that a male LCSO "would make 'sexual comments' to [her]," Pl.'s Dep. at 225:1, was "coming on" to her, *see id.* at 226:1-2, and would "express what he wanted to do and things of that nature," *id.* at 225:2-3.  Defendants proffered that plaintiff "did not elaborate on these 'sexual comments,'" Defs.' SMF ¶ 77, and that Akal never received a complaint "that [p]laintiff was being subject[ed] to unwanted harassment," *id.* ¶ 72.  Epps and Eaves testified that they had no record of plaintiff's complaints of sex discrimination or sexual harassment.  *See id.* ¶¶ 74-75.  According to plaintiff, Eaves and Epps "failed to act after [she] reported cyber stalking, sexual harassment and discrimination to them."  Pl.'s Resp. SMF ¶ 72.  She testified that she called the Hotline to complain "about the cyber stalking," *id.*, "[i]n reference to the treatment of [herself] being harassed and being followed," Pl.'s Dep. at 82:11-12.  Neither the complaint, as amended, nor plaintiff's EEOC charge of discrimination mentioned the LSCO's sexual comments, and plaintiff did not raise this matter with Eaves, Epps, or Akal.  *See* Defs.' SMF ¶ 77.

### 6. Complaints About Plaintiff's Conduct

Plaintiff's own conduct in the workplace generated complaints from co-workers, as summarized below.

### a. LCSO Gloria Shelton

The 12th Circuit contract required that a certified trainer be present on site.  *See* Defs.' SMF ¶ 79; Defs.' Mem., Ex. F, Dep. of Seva Singh ("Singh Dep.") at 93:3-16, ECF No. 55-8.  LCSO Gloria Shelton became a certified trainer in April 2016, and "conduct[ed] required trainings for Akal security personnel assigned to the Superior Court."  Defs.' SMF ¶ 78.  She was the only certified trainer at that site.  Defs.' SMF ¶ 79.

At Parris' request, Parris and Frost met on May 13, 2016, to discuss a personnel issue, *see id.* ¶¶ 80-81, namely "reports of [p]laintiff being disruptive in the workplace and engaging in harassing and intimidating conduct towards other employees to the point it was impairing security operations," *id.* ¶ 81.   LCSO Shelton had informed Parris that, "due to the harassment and intimidation she experienced from [p]laintiff, she was considering resigning her role as a trainer to return to her primary assignment." *Id.* ¶ 82.   Shelton submitted a complaint to Frost by email on May 19, 2016, *id.* ¶ 83, stating that plaintiff "was monitoring" her and warning that further interaction with plaintiff "could escalate to a verbal or physical altercation" between the two, *id.* ¶ 84.   Shelton stated that "[p]laintiff had created an intimidating and hostile environment." *Id.*

Frost made several attempts between May 19, 2016, and June 10, 2016, to meet with plaintiff about Shelton's complaint, *id.* ¶ 85, but plaintiff either was on leave or out sick, *id.* ¶ 86.   Plaintiff counters that "Frost never made any attempts to interview her."   Pl.'s Resp. SMF ¶ 86.

### b. CSO Erika Bumbry

On June 10, 2016, Frost received a complaint about plaintiff from CSO Erika Bumbry, who complained that, on June 1, 2016, plaintiff "engaged in inappropriate and harassing behavior by cornering her in the break room asking her 'who are you snitching on now?'"   Defs.' SMF ¶¶ 87-88; *see* Parris Dep., Ex. 1, ECF No. 55-5 at 69.   Plaintiff "continued her verbal attack on . . . Bumbry for approximately ten minutes until CSO Kevin Best walked in and tried to de-escalate the situation."   Defs.' SMF ¶ 89.   Bumbry "claimed that [she] was physically shaken by the incident and felt uncomfortable working with [p]laintiff."   *Id.* ¶ 90.   Plaintiff, who denies without support that Bumbry's statement was true, *see* Pl.'s Resp. SMF ¶¶ 88, 90, does not

otherwise dispute defendants' proffer.  Rather, she asserts only that Best did not attempt to de-escalate the situation.  *See id.* ¶ 89.

### 7. June 10, 2016, Training Class Incident

On June 10, 2016, LCSO Shelton was conducting a training session attended by plaintiff.  Defs.' SMF ¶ 91.  Shelton asked the participants to put their cell phones away, *see id.* ¶ 92, but plaintiff did not comply, *see id.* ¶ 93; Pl.'s Resp. SMF ¶ 93.  The parties dispute whether Shelton "politely and respectfully" sought plaintiff's compliance, Defs.' SMF ¶ 93, or whether Shelton "engaged in yelling and name-calling," Pl.'s Resp. SMF ¶ 94; *see id.* ¶ 93.  They also dispute whether plaintiff "became angry and aggressive towards Shelton," Defs.' SMF ¶ 95, or whether "she remained respectful while Shelton engaged in yelling and name-calling," Pl.'s Resp. SMF ¶ 95.

What is not disputed is that "Shelton radioed for assistance from a District Supervisor," and Epps responded.  Defs.' SMF ¶ 95.  According to defendants, "[w]hen Epps arrived, the class was in disarray[.]"  *Id.* ¶ 96.  Epps instructed the class to take a 15-minute break, *id.*, during which time plaintiff explained to Epps that she was using her phone to make "arrangements to bring her dad home from the hospital," *id.* ¶ 97.

Frost had planned to be at the Superior Court on June 10, 2016, to interview plaintiff about the "prior complaints he had received" about her conduct.  Defs.' SMF ¶ 98.  When he arrived, he was informed about "the verbal altercation . . . during training between Shelton and [p]laintiff."  *Id.* ¶ 99.  When he reached the training room, he encountered plaintiff in the hallway outside the classroom.  *Id.* ¶ 100.  Frost instructed plaintiff to wait for him in the District Supervisors' office.  *Id.*

Class participants were instructed to "provide written statement[s] regarding what occurred in the class that morning." *Id.* ¶ 101. Eaves assisted in gathering the statements but did not participate in the subsequent investigation of the incident. *Id.* ¶ 102.

Frost met with plaintiff in the District Supervisors' office. *Id.* ¶ 103. The parties dispute plaintiff's tone and demeanor at this meeting, with defendants describing her as "aggressive and kept interrupting" when Frost informed her of her right to have a union representative present. *Id.* According to plaintiff, she "simply asked for a union representative and then waited for the . . . representative to arrive." Pl.'s Resp. SMF ¶ 103. After Shop Steward James Clinton arrived, Frost informed them of "specifics of the allegations raised previously by LCSO Shelton and CSO Bumbry." Defs.' SMF ¶ 106.

### F. Plaintiff's Removal from the 12th Circuit Contract

Parris and Frost met, on June 10, 2016, to discuss "the specifics of what had occurred involving Shelton and [p]laintiff." Defs.' SMF ¶ 107. "When asked what steps were likely to be taken by Akal to correct the situation, Frost informed Parris that there would be a series of steps taken to attempt to correct [p]laintiff's behavior with her coworkers and management." *Id.* ¶ 108. Parris told Frost he "believed [p]laintiff's behavior was too disruptive to security operations to be allowed to continue." *Id.* ¶ 109. Later that day, Parris sent an email to Frost, Epps, Eaves, and Joseph Trindal, Akal's President, stating "that [p]laintiff's documented behavior (as recently as that morning) ha[d] become intolerable to the D.C. Courts." *Id.* ¶ 110. Parris instructed Frost to have plaintiff "turn in her equipment and credentials" and to "permanently remove" her from the 12th Circuit contract. *Id.* ¶ 111. "Plaintiff's removal was completed on June 10, 2016 at approximately 3:00 p.m." *Id.* ¶ 112.

Akal notified plaintiff, by letter dated June 17, 2016, "that the D.C. Courts had ordered [her] permanent removal . . . from the position of LCSO/LSSO," *id.* ¶ 113, explaining that it was required to do so "to comply with the directives issued under the terms of the contract," *id.* ¶ 114.  Plaintiff submitted a written appeal, dated June 24, 2016.  *Id.*  ¶ 118; *see* Pl.'s Dep., Ex. 11, ECF No. 55-3 at 175-76.  "In it, [p]laintiff stated that she believed 'this is a matter of [her] bringing concerns on ethics and discrimination forward' and that she attempted to bring forward matters that directly affected [her] in the workplace and involving discrimination and ethics violations without success' without stating more in detail."  Defs.' SMF ¶ 119.  Frost received the appeal on June 30, 2016.  *Id.* ¶ 120.

### G. Union Grievance

On plaintiff's behalf, the Union filed a grievance on June 21, 2016, Defs.' SMF ¶ 115, stating:

> . . . LSSO Janice Coclough . . . was placed in suspension status by Contract Manager Lawrence Frost.  CM Frost stated LSSO Coclough was suspended base[d] on an alleged complaint(s) of creating a hostile work environment.  LSSO was not and has not been informed, counseled or disciplined . . . prior to this personnel matter.

Pl.'s Dep., Ex. 13, ECF No. 55-3 at 180.  Akal responded on July 6, 2016, that, "as the case is a government removal case, the matter is explicitly excepted from the grievance procedure and neither grievable nor arbitrable."  Defs.' SMF ¶ 116; *see* Pl.'s Dep., Ex. 13, ECF No. 55-3 at 182.

### H. Plaintiff's Termination by Akal

Meanwhile, Frost investigated the June 10, 2016, classroom incident and LSSO Shelton's and CSO Bumbry's complaints, and in his July 1, 2016, report, concluded that plaintiff had "engaged in a pattern of harassing, intimidating, and bullying behavior [towards] her coworkers

that . . . created a hostile work environment for Akal employees at the D.C. Courts." Defs.' SMF ¶ 121. Parris, to whom Frost sent the report on July 8, 2016, deemed the investigation "good, thorough, and balanced." *Id.* ¶ 122. Based on the results of the investigation, Parris determined that "it was not in the best interests of the D.C. Courts that [p]laintiff return to the [c]ontract." *Id.* ¶ 123.

Akal notified plaintiff, by letter dated July 26, 2016, *see* Pl.'s Dep., Ex. 12, ECF No. 55-3 at 177, that "the D.C. Courts . . . denied her appeal and . . . upheld [its] previous decision to permanently remove her from performing under the D.C. Courts portion of the 12th [Circuit] Contract," Defs.' SMF ¶ 124. "[A]s a direct result of the D.C. Courts' denial of the appeal and subsequent permanent order of removal, [p]laintiff's employment as . . . LCSO [was] terminated effective July 26, 2016." Defs.' SMF ¶ 125. Akal deemed plaintiff ineligible for rehire. *Id.* ¶ 126. Epps and Eaves were not involved in the decision to terminate plaintiff's employment, as District Supervisors were not authorized to make termination decisions. *Id.* ¶ 127. "A female Akal employee, Dawn Peterson, was selected based on seniority to fill [plaintiff's former] position as . . . LCSO[.]" *Id.* ¶ 133.

### I. EEOC Charge of Discrimination

Plaintiff filed a formal charge of discrimination with the EEOC on June 23, 2016, alleging Akal retaliated against her. Defs.' SMF ¶ 117; *see* Pl.'s Dep., Ex. 14, ECF No. 55-3 at 184-85.

### J. Termination of LSSO A.C., SSO L.E., and CSO M.J.

Akal terminated three employees, all males and presumably heterosexual, upon their removal from the 12th Circuit contract at the client's direction. Defs.' SMF ¶ 129. None was "offered a transfer to another work location." *Id.* ¶ 130.

### 1. LSSO A.C.

On July 25, 2014, a female CSO made a sexual harassment complaint against LSSO A.C., and upon investigation, Akal sustained the charge.  *See generally* Henninger Decl., Ex. 10, ECF No. 55-4 at 65-72.  Parris determined that LSSO A.C., who had been suspended pending the outcome of the investigation, "was no longer permitted to work in the District of Columbia Court System[.]"  *Id.*, Ex. 10, ECF No. 55-4 at 73.  By letter dated September 12, 2014, Akal notified LSSO A.C. that "Akal . . . lost confidence in [his] ability to properly carry out [his] duties as a [LSSO]," and terminated his employment with Akal.  *Id.*, Ex. 10, ECF No. 55-4 at 75.

### 2. SSO L.E.

On April 15, 2014, a male SSO alleged that SSO L.E. assaulted him, and Akal sustained the charge after having investigated the matter.  *See generally* Henninger Decl., Ex. 11, ECF No. 55-4 at 81-83.  SSO L.E. had been suspended pending the outcome of the investigation.  *See id.*, Ex. 11, ECF No. 55-4 at 93.  Parris ordered that he not return to the contract.  *Id.*, Ex. 11, ECF No. 55-4 at 95.  Akal "lost confidence in [L.E.'] ability to properly carry out [his] duties . . . and comply with all policies and procedures," and terminated his employment effective June 4, 2015. *Id.*, Ex. 11, ECF No. 55-4 at 77.

### 3. CSO M.J.

Akal investigated and sustained a complaint that CSO M.J. allowed an individual to enter the courthouse without having checked that individual's identification.  *See generally* Henninger Decl., Ex. 12, ECF No. 55-4 at 103-04.  Although Akal proposed lesser discipline, USMS disagreed and instead directed that CSO M.J. be removed immediately and permanently from performing under the contract.  *Id.*, Ex. 12, ECF No. 55-4 at 101.  Consequently, Akal terminated CSO M.J.'s employment.  *See id.*, Ex. 12, ECF No. 55-4 at 97, 99.

## II.     LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  "A genuine issue of material fact exists 'if the evidence, viewed in a light most favorable to the nonmoving party, could support a reasonable jury's verdict for the nonmoving party.'"  *Figueroa v. Pompeo*, 923 F.3d 1078, 1085 (D.C. Cir. 2019) (internal quotation marks omitted) (quoting *Hairston v. Vance-Cooks*, 773 F.3d 266, 271 (D.C. Cir. 2014)).  The moving party bears the burden to demonstrate the "absence of a genuine issue of material fact" in dispute, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), while the nonmoving party must present specific facts, supported by materials in the record, that would be admissible at trial and that could enable a reasonable jury to find in its favor, *see Anderson v. Liberty Lobby, Inc.* ("*Liberty Lobby*"), 477 U.S. 242, 248 (1986); *Allen v. Johnson*, 795 F.3d 34, 38 (D.C. Cir. 2015) (noting that, on summary judgment, the appropriate inquiry is "whether, on the evidence so viewed, 'a reasonable jury could return a verdict for the nonmoving party'") (quoting *Liberty Lobby*, 477 U.S. at 248); *see also Greer v. Paulson*, 505 F.3d 1306, 1315 (D.C. Cir. 2007) ("[S]heer hearsay . . . counts for nothing on summary judgment." (internal quotation marks and citation omitted)); FED. R. CIV. P. 56(c), (e)(2)–(3).

"Evaluating whether evidence offered at summary judgment is sufficient to send a case to the jury is as much art as science."  *Estate of Parsons v. Palestinian Auth*., 651 F.3d 118, 123 (D.C. Cir. 2011).  This evaluation is guided by the related principles that "courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment," *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (per curiam), and "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor," *id.* at 651 (internal quotation marks

omitted) (alteration in original) (quoting *Liberty Lobby*, 477 U.S. at 255).  Courts "may not make credibility determinations or weigh the evidence," *Iyoha v. Architect of the Capitol*, 927 F.3d 561, 565 (D.C. Cir. 2019) (internal quotation marks and citations omitted), since "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge," *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000) (internal quotation marks and citation omitted); *see also Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 296 (D.C. Cir. 2015).

The fact that a plaintiff's testimony is uncorroborated is immaterial for purposes of summary judgment, since "[c]orroboration goes to credibility, a question for the jury, not the district court." *Robinson v. Pezzat*, 818 F.3d 1, 9 (D.C. Cir. 2016).  Nonetheless, for a factual dispute to be "genuine," the nonmoving party must establish more than "[t]he mere existence of a scintilla of evidence in support of [its] position," *Liberty Lobby*, 477 U.S. at 252, and cannot rely on "mere allegations" or conclusory statements, *see Equal Rights Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1141 n.3 (D.C. Cir. 2011) (internal quotation marks omitted); *accord* FED. R. CIV. P. 56(e).  If "opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Lash v. Lemke*, 786 F.3d 1, 6 (D.C. Cir. 2015) (internal quotation marks omitted) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).  The Court is only required to consider the materials explicitly cited by the parties, but may on its own accord consider "other materials in the record." FED. R. CIV. P. 56(c)(3).

Notably, "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.  In that

situation, summary judgment is properly granted against a party who, "after adequate time for

discovery and upon motion, . . . fails to make a showing sufficient to establish the existence of an

element essential to that party's case, and on which that party will bear the burden of proof at

trial." *Id.* at 322.

## III.   DISCUSSION

Plaintiff's sex and sexual orientation discrimination claims under the DCHRA are

addressed first, followed by her retaliation claims under Title VII and the DCHRA, and lastly her

sexual harassment claim under the DCHRA.  No claim survives this analysis.

### A. Counts IV and V: Sex and Sexual Orientation Discrimination Under DCHRA

In a case where plaintiff presents no direct evidence of discrimination, such as "a

statement that itself shows [unlawful] bias in the [employment] decision," *Vatel v. All. of Auto.*

*Mfrs.*, 627 F.3d 1245, 1247 (D.C. Cir. 2011), a plaintiff may prove discrimination through

circumstantial evidence using the familiar three-part burden-shifting framework of *McDonnell*

*Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973) (Title VII).  "Where there has been an

adverse employment action and the employer asserts a legitimate, non-discriminatory . . . reason

for the decision, we focus on pretext."  *Oviedo v. Wash. Metro. Area Transit Auth.*, 948 F.3d

386, 395 (D.C. Cir. 2020) (citing *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir.

2008)).  Thus, where an employer asserts a legitimate, nondiscriminatory reason for an adverse

employment action, the "central inquiry" for a court evaluating a defendant's motion for

summary judgment becomes "whether the plaintiff produced sufficient evidence for a reasonable

jury to find that the employer's asserted non-discriminatory reason was not the actual reason and

that the employer intentionally discriminated against the plaintiff on a prohibited basis."  *Id.*

(quoting *Iyoha*, 927 F.3d at 566); *see also DeJesus v. WP Co. LLC*, 841 F.3d 527, 532-33 (D.C. Cir. 2016).

In making this assessment at the summary judgment stage, courts may consider relevant evidence, including but not limited to: "(1) the plaintiff's *prima facie* case; (2) any evidence the plaintiff presents to rebut the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff (such as independent evidence of discriminatory statements or attitudes on the part of the employer)." *Hampton v. Vilsack*, 685 F.3d 1096, 1100 (D.C. Cir. 2012) (quoting *Waterhouse v. District of Columbia*, 298 F.3d 989, 992–93 (D.C. Cir. 2002)); *Carter v. George Washington Univ.*, 387 F.3d 872, 878 (D.C. Cir. 2004).  The plaintiff need not "submit evidence over and above rebutting the employer's stated explanation in order to avoid summary judgment." *Hamilton v. Geithner*, 666 F.3d 1344, 1351 (D.C. Cir. 2012).  Nonetheless, plaintiff's disagreement with, or disbelief of, the employer's explanation cannot, without more, "satisfy the burden of showing that a reasonable jury could find that the employer's asserted reason was not the actual reason and that the employer intentionally discriminated against the plaintiff on a prohibited basis." *Burton v. District of Columbia*, No. 10-cv-1750 (BAH), 153 F. Supp. 3d 13, 58 (D.D.C. 2015).

### 1. Plaintiff's Prima Facie Case

Generally, a plaintiff establishes a *prima facie* case of discrimination by showing that "(1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination." *Czekalski v. Peters*, 475 F.3d 360, 364 (D.C. Cir. 2007).  Here, the parties do not dispute that plaintiff is a member of a protected class who suffered two adverse actions: placement on unpaid administrative leave, which is considered here synonymous with a suspension, and termination.  Plaintiff asserts that

she suffered two additional adverse actions, *see* Pl.'s Opp'n at 9, but the record does not support this assertion.

First, plaintiff contends that Akal "fail[ed] to transfer [her] to another worksite or contract in lieu of termination," citing her deposition testimony, which merely reiterates that Akal did not offer her a transfer. *Id.* at 10 (citing Pl.'s Dep. at 255:16-18). Underlying this purported adverse action is the assumption that she was "eligible for rehire by Akal in other 12th Judicial Circuit facilities contracts – just not eligible for rehire on the same DC Courts contract." Pl.'s Resp. SMF ¶ 126. The deposition testimony on which she relies for this assumption, *see* Pl.'s Opp'n, Ex. I ("Frost Dep.") at 59:13-60:13, 130:18-132:9, ECF No. 60-1 at 204-05, 206-07, appears related to plaintiff being hired by another contractor, but does not dispute defendants' assertion that she "was not eligible for rehire with Akal," Defs.' SMF ¶ 126, even if open positions were available at another site, *see* Singh Dep. at 60:3-13. Thus, the record simply does not support plaintiff's position that Akal's decision not to offer her a transfer is an adverse action.

Second, plaintiff argues that she was subjected to "more severe punishment" because termination "exceeded the CBA's disciplinary policy," when Akal could have employed some "level[] of progressive action," Pl.'s Opp'n at 9, and chose instead to terminate her employment, even though plaintiff had not been "disciplined prior to her termination," *id.* at 10. She acknowledges, however, that "the CBA articulates a carveout for the disciplinary process of employees" who had been removed from working under the 12th Circuit contract by the client. *Id.* n.4. Defendants demonstrate, and plaintiff does not dispute, that Parris on behalf of the D.C. Courts removed plaintiff from the 12th Circuit contract, and therefore, plaintiff would not have been eligible for progressive discipline under the CBA. Thus, plaintiff's proposed adverse action of "more severe punishment" fails too.

The Court need not linger over the third element of the prima facie case because Akal proffers a legitimate nondiscriminatory reason for placing plaintiff on administrative leave and terminating her employment.  In this circumstance, "the only relevant inquiry . . . is whether [plaintiff] produced sufficient evidence for a reasonable jury to conclude that [Akal's] asserted nondiscriminatory reason for firing her was not the actual reason, and that instead [Akal] was intentionally discriminating against [plaintiff] on account of her" sex or sexual orientation. *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1114 (D.C. Cir. 2015).  "To answer that question at the summary judgment stage, the court assesses whether 'there is evidence from which a reasonable jury could find that the employer's stated reason for the firing is pretext' and that 'unlawful discrimination was at work.'"  *Burley*, 801 F.3d at 296  (quoting *Barnett v. PA Consulting Grp., Inc.*, 715 F.3d 354, 358 (D.C. Cir. 2013)).  The analysis is the same for discrimination claims under both Title VII and DCHRA.  *See id.* (noting that plaintiff's "Title VII claims and DCHRA claims . . . rise and fall together").

### 2. Proffered Legitimate Nondiscriminatory Reason for Termination

Akal proffered that plaintiff's termination came about due to Parris' decision on June 10, 2016, to remove her from the portion of the 12th Circuit contract covering the D.C. Courts.  *See* Defs.' Mem. at 20.  After having considered plaintiff's appeal and report of Frost's investigation of the classroom incident and LCSO Shelton's and CSO Bumbry's complaints, Parris upheld his removal decision and denied plaintiff's appeal.  *Id.*  Defendants further proffered that "Akal was required to remove [p]laintiff from work on the contract" at its client's direction, and because she "was no longer qualified to work on the contract for which she was hired," Akal terminated her employment.  *Id.*  In Akal's view, its treatment of plaintiff "was consistent with how Akal treated

other employees," Defs.' SMF ¶ 128, citing the termination at the client's behest of LSSO A.C.,

SSO L.E. and CSO M.J., discussed *supra* in Part I. J. 1-3.

### 3. Treatment of Similarly Situated Employees

Plaintiff attempts to discredit Akal's proffered nondiscriminatory reason by showing that

"male and heterosexual employees were not disciplined as severely as [she] for similar conduct,"

Pl.'s Opp'n at 10, pointing, in particular, to seven Akal employees outside of her protected class

whom Akal declined to terminate for purportedly similar offenses, *id.* at 11. The sole

comparator about whom the parties agree is CSO M.J.

"A plaintiff may support an inference that the employer's stated reasons were pretextual,

and the real reasons were prohibited discrimination or retaliation, by citing the employer's better

treatment of similarly situated employees outside the plaintiff's protected group, its inconsistent

or dishonest explanations, . . . or the employer's pattern of poor treatment of other employees in

the same protected group as the plaintiff[.]" *Walker v. Johnson*, 798 F.3d 1085, 1092 (D.C. Cir.

2015) (citing *Brady*, 520 F.3d at 495 & n.3); *see also Burley*, 801 F.3d at 324 ("A plaintiff can

establish pretext masking a discriminatory motive by presenting 'evidence suggesting that the

employer treated other employees of a different [gender] . . . more favorably in the same factual

circumstances.'" (quoting Brady, 520 F.3d at 495)). "To prove that [she] is similarly situated to

another employee, a plaintiff must demonstrate that [she] and the allegedly similarly situated . . .

employee[s] were charged with offenses of comparable seriousness." *Walker*, 798 F.3d at 1092

(quoting *Holbrook v. Reno*, 196 F.3d 255, 261 (D.C. Cir. 1999)) (citation and internal quotation

marks omitted). She "must also demonstrate that all of the relevant aspects of [her] employment

situation were nearly identical to those of the [other] employee[s]." *Id.* (quoting *Holbrook*, 196

F.3d at 261) (brackets in original) (internal quotation marks omitted). "Factors that bear on

whether someone is an appropriate comparator include the similarity of the plaintiff's and the putative comparator's jobs and job duties, whether they were disciplined by the same supervisor, and, in cases involving discipline, the similarity of their offenses." *Burley*, 801 F.3d at 301 (citation omitted).  "Whether two employees are similarly situated ordinarily presents a question of fact for the jury, but the [C]ourt may find that employees are not similarly situated as a matter of law if a reasonable jury would be unable to reach that conclusion." *Duru v. District of Columbia*, 303 F. Supp. 3d 63, 73 (D.D.C. 2018) (citations and internal quotation marks omitted).

Plaintiff proffers that her seven proposed comparators worked on the 12th Circuit contract and, thus, were subject to the same employment policies.  *See* Pl.'s Opp'n at 12. Notwithstanding the differences among their job titles and ranks, plaintiff posits that (1) no meaningful distinction was present between the duties of LCSOs, LSSOs, CSOs, and District Supervisors, *see id.*; (2) each proposed comparator was subject to discipline imposed by Parris, Frost, or an individual reporting to Frost, and that each was "subject to the decisional authority of . . . Akal's Human Resourses" Department,  *id.* at 13; and (3) each proposed comparator committed an offense similar to the offense plaintiff committed, *see generally id.* at 15-18.  The comparators' offenses include a fistfight between two CSOs, a sustained charge of sexual harassment against a District Supervisor, and an LSSO's unauthorized entry into secured areas of the Moultrie Courthouse, *see id.* at 16, yet the proposed comparators were suspended, demoted, or transferred, or received a written warning, not terminated as was plaintiff.  *See id.* at 17-18.

For purposes of this discussion, the Court presumes, as do defendants, *see* Defs.' Reply at 6, that plaintiff's proposed comparators had similar jobs, were disciplined by the same decisionmakers, and committed similar offenses.  Nonetheless, plaintiff's use of these

individuals as comparators, in contrast to SSO L.E., LSSO A.C. and CSO M.J. is fatally flawed, by ignoring three critical undisputed facts: D.C. Courts removed SSO L.E. and LSSO A.C. from the contract; USMS removed CSO M.J. from the contract; and the CBA's progressive disciplinary provisions do not apply in "client removal" cases.  These facts demonstrate that the situations of SSO L.E., LSSO A.C. and CSO M.J. were nearly identical to plaintiff's situation. Each was removed from the 12th Circuit contract; the CBA's disciplinary procedures were inapplicable; Akal terminated their employment; and none was offered a transfer to another position under any Akal contract.

The Court concludes that only SSO L.E., LSSO A.C. and CSO M.J. are proper comparators.  Plaintiff's other proposed comparators were not similarly situated to plaintiff, and Akal's employment decisions in those cases is not evidence suggesting that it treated male and heterosexual employees more favorably.

### 4. "Inconsistent and Dishonest" Explanations for Plaintiff's Termination

According to plaintiff, Akal's inconsistent or dishonest explanations for plaintiff's termination also support an inference that Akal's proffered legitimate, nondiscriminatory reason for termination is pretext for discrimination.  *See* Pl.'s Opp'n at 19.  Plaintiff's characterization of Akal's explanations does not hold up under scrutiny, however.

First, plaintiff asserts that "Akal's own corporate representative, Seva Singh, squarely contradicts" Akal's explanation that plaintiff was terminated because the D.C. Courts removed her from 12th Circuit contract, and opines that Akal could have transferred her to another of its contracts or to another building within the 12th Circuit on the same contract.  *See id.*  To support her position, plaintiff relies on the following excerpt from Singh's deposition testimony:

Q:      Okay.   I asked you earlier about progressive discipline.
Broadly speaking is transferring someone's work location a form of
progressive discipline?

A.      It's not a formal form of progressive discipline, no.

Q.      Is it a substitute for progressive discipline?

A.      It could be a supplement.

Q.      And are you aware of any time that that's happened?

A.      No, I'm not . . . No, not for the 12th [C]ircuit.  I'm not aware
of anything specifically.  There are transfers but they're usually
requested.  And I'm not aware of any other transfer taking place.

Q:      So with respect to progressive discipline or the consequence
of [plaintiff's] termination, is it Akal's position that the firing of
[plaintiff] upon the allegations here is consistent with what has
gotten other people fired on this contract?

A.      I would say that her situation is – as far as what's
documented, this is not a situation that was in our control.  The client
removed her and we were unable to continue working with her on
this contract.  And you asked me earlier if there were other positions
that she was qualified for.  I'm not aware of any other positions that
she would have been qualified for other than BWI, which is a
completely different operation.

Q.      And to be clear, you also testified that you didn't – in
preparation for today, you didn't go and check to see what other
positions besides BWI might have been within a 100-mile radius?

A.      That's correct.

Singh Dep. at 79:2-80:19; *see id.* at 60:3-13.

Plaintiff misconstrues Singh's testimony by characterizing this statement as an admission

about "other sites to which [p]laintiff could have been transferred."  Pl.'s Resp. SMF ¶ 126; *see*

Pl.'s Opp'n at 19.  At most, Singh establishes that Akal had another contract in the same general

geographical area around the time of plaintiff's removal from the 12th Circuit contract with open

positions for which plaintiff may have been qualified.  Neither the existence of, nor available

positions under, another Akal contract shows that plaintiff would have been eligible for transfer

to the BWI contract, or that she would have been considered for a position on the BWI contract,

or that she would be eligible for rehire by Akal anywhere.

Notably, the questioning of Singh began with the presumption that Akal would not have put plaintiff in another position because she had been removed from the 12th Circuit contract:

> Q:    I asked whether there were any other jobs within a 100-mile radius for which [plaintiff] had been eligible after she was removed from the contract by Mr. Parris.  And I understand that your answer was that Akal wouldn't put her in another position.  Is that right?
> A.    Correct.

Singh Dep. at 57:1-8.  Further, Singh testified he was "not aware of [Akal] transferring anybody that had a client removal to another contract at another location."  Singh Dep. at 81:15-17; *see id*. at 79:18-19.  Rather than contradicting Akal's legitimate nondiscriminatory reason for terminating plaintiff's employment, Singh's testimony in fact supports it.

Second, plaintiff points to CSO M.J.'s removal from the 12th Circuit contract by USMS.  Pl.'s Opp'n at 19.  When this CSO was permanently removed from the contract, the USMS specified that the removal "does not, in any way, prevent [CSO M.J.] from continued employment with AKAL; it only prevents him from performing services under this contract."  *Id*.  In support, plaintiff refers to an exhibit filed under seal without permission, *see* Pl.'s Opp'n, Ex. P, and the Court declines to consider it.  That said, even though USMS carved out an exception for CSO M.J., the record demonstrates that Akal still fired him.  Rather than undermining Akal's proffer that removal from the contract necessarily meant termination, Akal's action regarding CSO M.J. is consistent with the treatment plaintiff received.

### 5. Akal's Treatment of Female and Homosexual Employees

Plaintiff's next effort to demonstrate pretext arises from Akal's alleged mistreatment of female employees.  *See generally* Pl.'s Opp'n at 21-22.  Plaintiff's brief is less than helpful, however.  She points generally to an assortment of exhibits as "evidence strongly evinc[ing] Defendants' discriminatory intent," *id.* at 22, but these exhibits were filed under seal without

permission and, in any event, plaintiff utterly fails to explain their significance and how they

help her position, leaving any "evinc[ing]" to the Court to pursue.  Thus, she fails to demonstrate

an alleged pattern of discriminatory treatment of female and homosexual employees.

***

Defendants have proffered a legitimate, nondiscriminatory reason for plaintiff's

placement on unpaid administrative leave and termination: the D.C. Courts removed her from the

12th Circuit contract.  Plaintiff's efforts to show that defendants' reason is pretext for

discrimination based on sex and sexual orientation fall short.  Her proposed comparators were

not similarly situated, and defendants' treatment of these male and heterosexual employees does

not show pretext for discrimination.  Nor does plaintiff demonstrate that defendants offered

inconsistent or dishonest reasons for their employment decisions. Accordingly, defendants are

entitled to judgment on plaintiff's sex and sexual orientation discrimination claims under the

DCHRA in Counts IV and V.

### B.  Counts II and VII: Retaliation Under Title VII and DCHRA

The burden-shifting framework set forth in *McDonnell Douglas* also applies to a

retaliation claim.  *See Walker*, 798 F.3d at 1091.  A prima facie case of retaliation requires a

showing (1) that plaintiff engaged in statutorily protected activity; (2) that she suffered a

materially adverse action at the hands of her employer; and (3) that a causal link connects the

two.  *Gaujacq v. EDF, Inc.*, 601 F.3d 565, 577 (D.C. Cir. 2010); *see Hamilton*, 666 F.3d at 1357.

In the retaliation context, a materially adverse action "encompass[es] a broader sweep of

actions than those in a pure discrimination claim."  *Baloch v. Kempthorne*, 550 F.3d 1191, 1198

n.4 (D.C. Cir. 2008).  Retaliatory actions are "'not limited to discriminatory actions that affect

the terms and conditions of employment' and may extend to harms that are not workplace-related

or employment-related so long as 'a reasonable employee would have found the challenged

action materially adverse.'" *Id*. (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S.

53, 64, 68 (2006)).  Put another way, to be "materially adverse," an action need only be of the

type that "might have dissuaded a reasonable worker from making or supporting a charge of

discrimination." *Burlington N*., 548 U.S. at 68 (quoting *Rochon v. Gonzales*, 438 F.3d 1211,

1219 (D.C. Cir. 2006)).

"Title VII retaliation claims must be proved according to traditional principles of but-for

causation . . . requir[ing] proof that unlawful retaliation would not have occurred in the absence

of the alleged wrongful action . . . of the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570

U.S. 338, 360 (2013); *see Nunnally v. District of Columbia*, 243 F. Supp. 3d 55, 67 (D.D.C.

2017) (noting "but-for" causation applies for Title VII or DCHRA retaliation claim).

If plaintiff successfully sets forth her prima facie case, "the burden shifts to the employer

to provide a legitimate, nonretaliatory reason for its action," and if the employer meets this

burden, "the burden-shifting framework disappears and the question becomes whether a

reasonable jury could infer . . .  retaliation from all the evidence, which includes not only the

prima facie case but also the evidence the plaintiff offers to attack the employer's proffered

explanation for its action and other evidence of retaliation." *Durant v. District of Columbia

Gov't*, 875 F.3d 685, 697 (D.C. Cir. 2017) (citations and internal quotation marks omitted).  At

this juncture, "the inquiry focuses on whether plaintiff has come forward with evidence showing

that the proffered reason is not the actual reason, and that the actual reason was retaliation."

*Thomas v. Securiguard, Inc*., 412 F. Supp. 3d 62, 88 (D.D.C. 2019).

### 1. Prima Facie Case Establishes Protected Activity and Adverse Actions

Defendants do not dispute that plaintiff engaged in protected activity, which plaintiff

identifies as: (1) appeal of her removal from the 12th Circuit contract; (2) filing an EEOC charge

of discrimination; and (3) complaining to Epps and Eaves "on countless occasions in 2015 and 2016," and to Akal's Hotline about scheduling and overtime. *See* Pl.'s Opp'n at 23; Defs.' Mem. at 25.[8]  In addition, the parties agree that placement on unpaid administrative leave and termination are adverse employment actions plaintiff suffered. *See* Defs.' Mem. at 24-25; Pl.'s Opp'n at 24.[9]

Plaintiff claims to have suffered additional adverse employment actions. *See* Pl.'s Opp'n at 24-26.  The Court accepts, for purposes of this discussion, her assertion that "male and heterosexual court security officers [had] more opportunities for overtime work," thereby "depriv[ing p]laintiff of her ability to obtain overtime pay," Pl.'s Opp'n at 25 (citing *Taylor v. Solis*, 571 F.3d 1313, 1321 (D.C. Cir. 2009)), for the proposition that a "temporary deprivation of wages counts as a materially adverse action," *Taylor*, 571 F.3d at 1321.  While defendants contend that "[p]laintiff was never denied the opportunity for overtime," Defs.' Mem. at 25, and plaintiff does not demonstrate she had been deprived of wages entirely, even for a limited period, as was the plaintiff in *Taylor*, or that she never had the opportunity to work overtime, given the disputed facts, the Court will assume in plaintiff's favor that the denial of overtime hours was an adverse employment action.

By contrast, plaintiff's assertion that Frost's investigation of her conduct was materially adverse by "pos[ing] an objective harm to [her] reputation and prospects" and "directly

---

[8]    Plaintiff also contends that she engaged in protected activity when wrote to and sought a meeting with Frost on February 10, 2016, and when she filed Union grievances on November 3, 2015, June 10, 2016, and July 12, 2016.  *See* Pl.'s Opp'n at 23-24.  Plaintiff's letter to Frost, *see id.*, Ex. DD, ECF No. 60-1 at 800-03, is not one the Court is considering on summary judgment, and the only grievance considered on summary judgment is a November 3, 2015, grievance pertaining to plaintiff's pay, which the Union declined to pursue, *see* Henninger Decl., Ex. 4, ECF No. 55-4 at 35.  Even if these additional protected activities were considered, the resolution of plaintiff's retaliation claim would remain the same given the legitimate, nonretaliatory reason for the challenged action.

[9]    Plaintiff has withdrawn her claim that removal of payroll duties is a materially adverse action and abandons her retaliation claim arising from Akal's alleged failure to accommodate her request to work a midnight shift.  *See* Pl.'s Opp'n at 24 n.18.

result[ing] in her suspension, unpaid administrative leave, and termination," Pl.'s Opp'n at 25, is not a cognizable adverse employment action.  Plaintiff deems the investigation itself retaliatory and asserts, without support, that Bumbry "backdated" her complaint, that defendants "directly implored LSSO Shelton" to submit a written complaint against her, and that Eaves "contributed" to the investigation "by obtaining . . . additional damaging information in the form of CSO Bumbry's backdated complaint, [thereby ensuring] Frost[] was aware of it prior to speaking to [p]laintiff" on June 10, 2016.  *Id.* at 25-26.

The investigation was an interim step that followed plaintiff's removal from the 12th Circuit contract by Parris, placement on unpaid administrative leave by Frost, and Akal's written notice to plaintiff that the D.C. Courts ordered her permanent removal from her LCSO position, and preceded the denial of her appeal.  In this respect, the investigation was not an actual employment decision, adverse or otherwise.  Although plaintiff clearly considered Frost's investigation an unwelcome and negative development, she has not shown that the investigation of Shelton's and Bumbry's complaints and her conduct on June 10, 2016, would itself have altered the terms and conditions of her employment, or would have dissuaded her from engaging in the protected activities mentioned above.[10]

### 2. No "But for" Causation Shown Regarding Overtime

Defendants deny that plaintiff was ever "denied the opportunity for overtime," *see* Defs.' Mem. at 25, while plaintiff claims that "[b]ut for [her] 2015-2016 complaints of [d]efendants' discriminatory practices, [d]efendants would not have denied her opportunities for overtime,"

---

[10]     Plaintiff further asserts that "the denial of [her] request for appeal is also materially adverse" because this denial "harmed [her] ability to defend herself and deprived [her] of her employment" and  thus would "dissuade a reasonable employee in [her] position."  Pl.'s Opp'n at 25.  If plaintiff is suggesting that she had no opportunity to "defend herself," the record demonstrates otherwise: she submitted a written appeal on June 24, 2016, for Parris' consideration.  The record also demonstrates that, while Parris had the authority to remove plaintiff from the 12th Circuit contract, he had no authority to terminate plaintiff's employment with Akal.  Thus, Parris' denial of plaintiff's appeal could not itself have deprived her of employment.

Pl.'s Opp'n at 27.  If, indeed, deprivation of opportunities for overtime is a materially adverse

action, plaintiff does not demonstrate that retaliation for her many complaints about overtime and

scheduling is the only reason for it.

Defendants establish, and plaintiff does not dispute, that overtime hours were assigned

based on seniority.  Eaves' testimony supports plaintiff's contention that, even among court

security officers with similar seniority, certain of them got preferential treatment with regard to

overtime.  *See* Eaves Dep. at 25:22-25:7. Yet, the record does not establish plaintiff's level of

seniority, and her position with respect to the officers who allegedly received preferential

treatment is not clear.  Nor does the record demonstrate that plaintiff's overtime hours were

reduced.  Her testimony establishes her *belief* she was offered fewer overtime hours, *see* Pl.'s

Dep. at 52:5-6, that she "would have to ask . . . for overtime," *id.* at 52:13-14, and that other

officers would get more overtime hours than she did, *see id.* at 53:2-9; 54:2-5.  Plaintiff points to

no materials in the record to quantify the alleged deprivation.  For example, plaintiff does not

show the number of overtime hours she previously was offered for comparison to the number of

hours she was offered after her many complaints in 2015 and 2016.  Furthermore, while Akal

indisputably received anonymous complaints to the Hotline about scheduling, *see generally*

Henninger Decl., Ex. 5, ECF No. 55-4 at 38-49, the record shows that the company investigated

those complaints and concluded the complaints were unfounded, *see generally* Parris Dep., Ex.

2, ECF No. 55-4 at 84-86; Henninger Decl., Ex. 6, ECF No. 55-4 at 50-52.

### 3. "But for" Causation Standard Does Not Apply Regarding Termination

"As for [her] termination," plaintiff argues that temporal proximity demonstrates

causation.  Pl.'s Opp'n at 27.  In less than seven weeks, she states, she filed an EEOC charge of

discrimination, filed a union grievance, and appealed her removal from the 12th Circuit contract;

during this same time period Akal notified plaintiff of its termination decision, Frost completed

his investigation, and Parris denied her appeal. *See id.* "The temporal proximity between an

employee's protected activity and her employer's adverse action is a common and often

probative form of evidence of retaliation." *Walker*, 798 F.3d at 1092 (citations omitted). In this

case, however, where Akal "provided a legitimate, nonretaliatory reason for its employment

action, positive evidence beyond mere proximity is required to defeat the presumption that the

proffered explanation is genuine." *Durant*, 875 F.3d at 700 (internal quotation marks, and

brackets omitted); *see Waggel v. George Washington Univ.*, 957 F.3d 1364, 1376 (D.C. Cir.

2020) ("While timing can establish a *prima facie* case of retaliation, dislodging an employer's

nonretaliatory explanation as pretextual at the third step of *McDonnell Douglas* requires positive

evidence beyond mere proximity.") (citations and internal quotation marks omitted).

       As discussed above, Akal placed plaintiff on administrative leave because of Shelton's

and Bumbry's complaints and because of the June 10, 2016, training class incident, and

terminated her employment because the D.C. Courts permanently removed her from the 12th

Circuit contract. *See* Defs.' Mem. at 26. Plaintiff does not put forward evidence showing that

retaliation, not Akal's proffered explanation, is the reason for administrative leave and

termination.

       Plaintiff, who undeniably engaged in protected activity, fails to show that she suffered

adverse employment actions because of that activity. Assuming that the deprivation of overtime

hours is an adverse action, plaintiff's showing of "but for" causation falls far short. Moreover

where, as here, defendants proffered a legitimate nonretaliatory reason for placing her on unpaid

administrative leave and for terminating her employment, and plaintiff failed to demonstrate that

the reasons is pretext for unlawful action, plaintiff's retaliation claim must fail.

### C. Count VI: Sexual Harassment Under DCHRA

Lastly, plaintiff claims that she was subject to sexual harassment under the DHRA. "To establish a prima facie case of hostile work environment based on sexual harassment, a plaintiff must demonstrate that (1) she is a member of a protected class; (2) that she was subject to unwelcome harassment; (3) the harassment occurred because of her sex; (4) the harassment affected a term, condition, or privilege of employment; and (5) there is a basis for holding the employer liable for the creation of the hostile work environment." *Craig v. District of Columbia*, 74 F. Supp. 2d 349, 370 (D.D.C. 2014) (citations omitted). A sexual harassment claim is actionable if it establishes "a sexually objectionable environment . . . both objectively and subjectively offensive, . . . that a reasonable person would find hostile or abusive, and . . . that the victim did in fact perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998). The Court must consider "the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance." *Baloch*, 550 F.3d at 1201. Not all objectional activity is actionable. "[O]nly when offensive conduct 'permeates the workplace with discriminatory intimidation, ridicule, and insult that is sufficiently severe and pervasive to alter the conditions of the victim's employment and create an abusive working environment'" is there a violation of the law. *Barbour v. Browner*, 181 F.3d 1342, 1347-48 (D.C. Cir. 1999) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)) (brackets omitted). The severity and pervasiveness of the alleged harassment is assessed from the perspective of a reasonable employee in plaintiff's situation. *See Oncale*, 523 U.S. at 81.

Whether an employer is liable "for a hostile work environment sexual harassment claim differs depending on who does the harassing." *Curry v. District of Columbia*, 195 F.3d 654, 659

(D.C. Cir. 1999) (per curiam).  If the alleged harasser is a coworker, not a supervisor, plaintiff

must show that "the employer knew or should have known of the harassment and failed to

implement prompt and appropriate corrective action."  *Id.* at 660.

Defendants contend that plaintiff can produce no evidence of having been subjected to

harassment at all.  *See* Defs.' Mem. at 27.  Although her Second Amended Complaint alleges

generally "numerous incidents and complaints regarding her employment with Akal," defendants

argue that no evidence suggests she experienced those incidents because of her sex or sexual

orientation.  *Id.*  For example, Akal notes that no complaint was received "indicating that any

employee in the control room improperly used surveillance cameras to 'zoom in' on the body

parts of individuals or otherwise made . . . inappropriate or lewd statements about any individual

. . . viewed through the cameras," *id.* at 27-28, or that "anyone at Akal [received a complaint]

that [p]laintiff was being subject to unwanted harassment," *id.* at 28.  Insofar as plaintiff alleges

that, at some unspecified time and place, an LCSO "propositioned" her, defendants consider her

allegation of his having made "unspecified sexual comments" too vague for any factfinder to

conclude she had been harassed.  *Id.* at 30.  In defendants' view, even if these incidents

attributable to this same LCSO occurred, they were not severe or pervasive, and did not change

the terms or conditions of plaintiff's employment.  *See id.* at 29-30.

Plaintiff relies almost exclusively on her deposition testimony to breathe life into her

sexual harassment claim.  Although plaintiff had not disclosed her sexual orientation, she

testified that other officers spoke harshly in her presence about homosexuals generally and about

Parris specifically, suggesting that the workplace was inhospitable to gay employees.  She also

testified about rumors in the workplace of her sexual orientation, that employees assumed she is

gay, and that she was treated differently because of her perceived sexual orientation.  A

factfinder could reasonably conclude from plaintiff's testimony that the misuse by control room personnel of cameras to "zoom in" on the body parts of female entrants to the courthouse supports plaintiff's claim that the work environment was hostile to female employees.  Further, a factfinder could reasonably infer from plaintiff's testimony that daily monitoring of and comments on her movements throughout the courthouse could be harassing behavior due to her sex and sexual orientation, as these incidents allegedly occurred only when plaintiff was with CSO Adams, and that had plaintiff been a man or heterosexual woman, time spent in Adams' company would not have drawn attention.  Likewise, for purposes of this sexual harassment claim, the Court assumes a factfinder could reasonably conclude that CSO Best's statement about seeing plaintiff sitting in Adams' lap and leaving them "privacy" could support plaintiff's position that others perceived her as gay and in homosexual relationship with Adams.  That Akal has no written record of plaintiff's complaints on these matters is not dispositive.  An employee could make a complaint to her supervisors, to Akal's Human Resources Department, or to the Hotline, and here, plaintiff testified that she made complaints about sexual harassment to Epps and Eaves.

"For sexual harassment to be actionable, it must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986) (citations, brackets, and internal quotation marks omitted).  Plaintiff's case falls apart because her proffered testimony and all assumed inferences drawn in her favor, cannot meet this standard.  Taken together, the events plaintiff describes may have been offensive, unprofessional and juvenile, but cannot demonstrate an abusive workplace "permeated with 'discriminatory intimidation, ridicule, and insult.'" *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1983) (quoting *Vinson*, 477 U.S. at 65).

While plaintiff may have been perceived as gay and felt she was "treated differently" because of her sexual orientation, her testimony does not describe who treated her differently or how she was treated differently. Neither plaintiff's gender nor her sexual orientation prevented her promotion to LCSO nor is shown to have played a role in the investigation of plaintiff's conduct, placement on unpaid administrative leave, or termination.

An LSSO may have made "sexual comments" to plaintiff on several occasions, but her testimony is far too vague to show that these incidents had any real impact on plaintiff or her employment. Plaintiff proved to be quite capable of raising complaints about workplace issues for herself and on behalf of others, yet the record demonstrates that she made no complaint to supervisors, Akal's Human Resources Department or the Hotline about the LSSO's comments. Furthermore, "workplace harassment, even harassment between men and women, is [not] automatically discrimination because of sex merely because the words used have sexual content or connotations." *Oncale*, 523 U.S. at 80.

The examples of misuse of surveillance cameras, either to "zoom in" on body parts of other women or to track plaintiff's movements throughout the courthouse, however frequent, are akin to "simple teasing, offhand comments, and isolated incidents," *Faragher*, 524 U.S. at 788, that would not rise to the level of discriminatory changes to terms or conditions of employment. There is no testimony that plaintiff ever was physically touched or threatened, or that plaintiff felt humiliated, or that any of the purported harassment interfered with plaintiff's work performance.

In short, considering plaintiff's sworn testimony and the totality of the circumstances from the perspective of a reasonable person in plaintiff's position, the Court concludes that plaintiff's sexual harassment claim fails as a matter of law. Absent a viable sexual harassment

claim, there is no basis to hold Akal, Epps, or Eaves liable and they are entitled to summary judgment on this claim.

## IV. CONCLUSION

Based on the undisputed material facts, defendants demonstrate their entitlement to judgment as a matter of law on all counts.  Plaintiff does not show that defendants' legitimate nondiscriminatory reason for placing her on unpaid administrative leave and for her termination was pretext for discrimination based on sex or sexual orientation or retaliation for having engaged in protected activity.  Nor does plaintiff show that, "but for" unlawful retaliation, defendants would have deprived her of overtime hours.  Nor does plaintiff's deposition testimony, the only evidence in support of her final claim, establish an actionable sexual harassment claim.

An Order consistent with the conclusions reached in this Memorandum Opinion will be issued contemporaneously.


DATE: March 13, 2022                              /s/  *Beryl A. Howell*

                                                  BERYL A. HOWELL
                                                  Chief Judge